J-S23002-20

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| ASPEN ENTERPRISES, LLC | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| KIA THOMAS | : | |
| | : | |
| Appellant | : | No. 3436 EDA 2019 |

Appeal from the Judgment Entered January 14, 2020
In the Court of Common Pleas of Delaware County Civil Division at
No(s): No. CV-2017-010493

BEFORE: NICHOLS, J., McCAFFERY, J., and FORD ELLIOTT, P.J.E.

MEMORANDUM BY NICHOLS, J.:                    Filed: November 5, 2020

Appellant Kia Thomas appeals from the judgment entered in favor of Appellee Aspen Enterprises, LLC, following a non-jury trial. Appellant claims the trial court erred by dismissing her counterclaim for rent paid to Appellee, admitting certain testimony, and awarding damages. We affirm.

We adopt the trial court's findings of fact. *See* Trial Ct. Op., 7/9/19, at 3-19. On January 8, 2018, Appellee sued Appellant for breach of contract, specifically that Appellee breached the residential lease agreement by failing to pay rent and damaging the property in question. *See* R.R. at 15a-17a.[1] In relevant part, Appellee claimed that Appellant owed rent for November 2017

_____

[1] We may cite to the reproduced record for the parties' convenience.

through February 2018. *Id.* at 13a-14a. Appellant filed an answer, new matter, and counterclaim on February 15, 2018.

Appellant's counterclaim alleged that she paid rent to Appellant between May 2017 and November 2017. *Id.* at 43a. Appellant asserted that in November 2017, she learned that Appellee did not obtain an occupancy permit that was required by a City of Chester ordinance (Chester Ordinance). *Id.* According to Appellee, Section 1703.02 "precludes an owner from collecting rent or obtaining possession of the property during any period of non-compliance with the Ordinance." *Id.*

The Chester Ordinance states, in relevant part:

1703.02 SINGLE FAMILY RESIDENCES AND DUPLEX RESIDENCES

a. No owner shall occupy or let to any other occupant any dwelling unit unless a Use and Occupancy Permit has been obtained from the Department of Public Safety.

\* \* \*

c. Any owner who is required to obtain a Use and Occupancy Permit under this Article shall be subject to all remedies allowed by law including prosecution and fines under any applicable City ordinance and in addition thereto they shall be denied the right to recover possession of the premises or to collect rent during any period of noncompliance[.]

*Id.* at 47a. In Appellant's view, Appellee improperly (1) collected rent when it did not have an occupancy permit and (2) withheld her security deposit. *Id.* at 43a-44a.

Appellee filed preliminary objections in the nature of a demurrer to Appellant's counterclaim. *Id.* at 51a. Specifically, Appellee contended,

- 2 -

among other things, that Section 1703.02 did not provide for a private cause of action. *Id.* at 53a.

Appellant filed an answer and supporting brief in response to Appellee's preliminary objections. In Appellant's view, Section 1703.02(c) "provides that the landlord shall be subject to all remedies allowed by law." *Id.* at 108a. Appellant reasons that she must be permitted to use the Chester Ordinance as a defense to Appellee's claim or "the Ordinance would not be enforceable and would have no substance," as a "landlord would have no incentive to comply with the Ordinance." *Id.* at 109a. The trial court sustained Appellee's preliminary objections and dismissed Appellant's counterclaim without prejudice to file an amended answer, new matter, and counterclaim. *Id.* at 114a. Appellant filed an amended answer, new matter, and counterclaim, which omitted her claim under Section 1703.02. *Id.* at 120a.

Following discovery, the trial court held a non-jury trial on May 2, 2019. The trial court summarized the parties' testimony as follows:

> At trial, Mr. Neal Fulves testified in his capacity as the principal of [Appellee], and [Appellee] called John C. Winter, a former insurance adjuster and currently a restoration contractor as a damage expert. [Appellee] introduced seven (7) exhibits into the record which consisted of the original lease between the parties, an assignment of the lease, text messages, a lease addendum, photographs, and a damage estimate prepared by John C. Winter, LLC. [Appellee] also called [Appellant] on cross-examination. [Appellant] testified on her own behalf and presented six (6) exhibits into the record consisting of City of Chester Ordinance No. 9, dated April 27, 2016, City of Chester correspondence dated November 17, 2017 notifying [Appellee] that the rental premises were lacking a certificate of occupancy, a repair receipt,

photographs, an agreement of sale for the premises and a notice
to quit.

Trial Ct. Op., 1/22/20, at 1-2.

The trial court entered a decision in favor of Appellee. Trial Ct. Op.,
7/9/19, at 1. The trial court found Mr. Winter's testimony concerning needed
repairs for the property to be credible, but found that many of the damages
Appellee complained of were the result of water damage from the leaking roof.
*Id.* at 21. The trial court also held that because Appellee did not have a
certificate of occupancy, the lease was terminated on November 17, 2017.
*Id.* at 22. As a result, the trial court found Appellant did not have to pay rent
or late fees for December 2017 through February 2018. *Id.*

Appellant timely filed a post-trial motion claiming (1) that the trial court
erred by dismissing her counterclaim under the Chester Ordinance, (2) that
the trial court erred by permitting the testimony of Mr. Winter, and (3) that
the award of damages was against the weight of the evidence. R.R. at 471a-
72a. The trial court denied Appellant's post-trial motion on November 14,
2019. *Id.* at 483a.

Appellant filed a notice of appeal on December 2, 2019.[2] On January
14, 2020, Appellant praeciped for judgment for $6,333.77, perfecting her

_____

[2] Ordinarily, the "Commonwealth Court of Pennsylvania has jurisdiction over
appeals from final orders of the courts of common pleas in any case implicating
the application, interpretation or enforcement of a local ordinance."
***Commonwealth v. Asamoah***, 809 A.2d 943, 945 n.1 (Pa. Super. 2002)

premature notice of appeal. Appellant timely filed a court-ordered Pa.R.A.P. 1925(b) statement.

On appeal, Appellant raises two issues:

1. The [trial] court erred in dismissing [Appellant's] counter-claim for recovery of rent paid to [Appellee] for the time [Appellee] did not possess an occupancy permit for the premises in violation of Section 1703.02 of the codified ordinances of the City of Chester.

2. The [trial] court erred in awarding [Appellee] $6,333.77 . . . because

a. [Appellee did not comply with the provisions of 68 [P.S. §] 512 and therefore should be precluded from recovery of any damages for damage[] to the premises.

b. The [trial] court erred in admitting the testimony of John C. Winter who inspected the premises over a year after [Appellant] had moved out of the premises.

c. The verdict was against the weight of the evidence.

Appellant's Brief at i-ii (formatting altered).

### Dismissal of Private Right of Action Counter-Claim

Appellant's first issue is that the trial court erred in sustaining Appellee's preliminary objections to her counter-claim to recover the rent she paid to Appellee. *Id.* at 14-18. Appellant argues that Appellee violated Section 1703.02 of the Codified Ordinances of the City of Chester, which prohibits a

---

(citation omitted). Because neither party has objected to this Court's jurisdiction, we proceed. **See** Pa.R.A.P. 741(a). **Cf. Smith v. Ivy Lee Real Estate, LLC**, 152 A.3d 1062, 1065 (Pa. Super. 2016) (transferring appeal involving municipal ordinance to Commonwealth Court although the parties did not challenge Superior Court's appellate jurisdiction).

landlord who has failed to obtain a use and occupancy permit from collecting rent. *Id.* at 15. Appellant asserts that "[t]he [Chester] Ordinance specifically provides that the landlord shall be subject to all remedies allowed by law." *Id.* at 15, 17. Appellant claims that although the trial court denied Appellee unpaid rent as damages, the trial court also denied her the right under the Chester Ordinance to recover the rent she already paid. *Id.* at 16. In support, Appellant cites *Frempong v. Richardson*, 209 A.3d 1001 (Pa. Super. 2019), where this Court interpreted a similar Philadelphia ordinance. *Id.* at 16-17. Appellant acknowledges that the Chester and Philadelphia ordinances are not identical, but argues that because Appellee "initiated this action in violation of the [Chester] Ordinance, [Appellant] should be allowed to recover rent that was unjustly paid to the [Appellee], rent it was not entitled to." *Id.* at 18.

Appellee responds that the Chester Ordinance provides for an enforcement action by the City of Chester for any violation, but does not create a private cause of action. Appellee's Brief at 6-7 (citing Sections 1703.02 and 1703.99 of the Codified Ordinances of the City of Chester). Appellee argues that *Frempong* is distinguishable from the facts of this case because *Frempong* did not involve a tenant's counterclaim under a similar ordinance. *Id.* at 8.

Initially, we note the following:

Our standard of review of an order of the trial court overruling or granting preliminary objections is to determine whether the trial court committed an error of law. When considering the

- 6 -

> appropriateness of a ruling on preliminary objections, the appellate court must apply the same standard as the trial court.
>
> Preliminary objections in the nature of a demurrer test the legal sufficiency of the complaint. When considering preliminary objections, all material facts set forth in the challenged pleadings are admitted as true, as well as all inferences reasonably deducible therefrom. Preliminary objections which seek the dismissal of a cause of action should be sustained only in cases in which it is clear and free from doubt that the pleader will be unable to prove facts legally sufficient to establish the right to relief. If any doubt exists as to whether a demurrer should be sustained, it should be resolved in favor of overruling the preliminary objections.

*Am. Interior Constr. & Blinds Inc. v. Benjamin's Desk, LLC*, 206 A.3d 509, 512 (Pa. Super. 2019) (citation omitted).

"We review a question of statutory interpretation *de novo*, and the scope of our review is plenary." *Frempong*, 209 A.3d at 1009 (citation omitted and formatting altered). "While the Statutory Construction Act is not expressly applicable to the construction of local ordinances, the principles contained therein are nevertheless useful." *Id.* at 1010 (citation omitted).

The *Frempong* Court addressed, among other issues, the interpretation of Section 9-3901(4)(e) of the Philadelphia Code, which similarly states that an owner without a rental license "shall be denied the right to recover possession of the premises or to collect rent during" the period of noncompliance. *See id.* at 1008 (quoting Phila. Code. § 9-3901(4)(e)). *Cf.*

R.R. at 47a (quoting the Chester Ordinance at issue). ***Frempong***, however, did not address whether a tenant had a private right of action.[3]

There are two types of a private right of action: explicit and implicit.[4] ***See Estate of Witthoeft v. Kiskaddon***, 733 A.2d 623, 626 (Pa. 1999). If a statute does not explicitly, *i.e.*, expressly, provide a private remedy, then Pennsylvania has adopted "a three-prong analysis to assist in determining whether a private remedy is implicit in a statute not expressly providing one." ***Id.*** (citation omitted). Our Supreme Court has framed the three-prong implicit analysis as follows:

> first, is the plaintiff one of the class for whose **especial** benefit the statute was enacted,—that is, does the statute create a right in favor of the plaintiff? Second, is there any indication of legislative intent, explicit or implicit, either to create such a remedy or to deny one? Third, is it consistent with the underlying purposes of the legislative scheme to imply such a remedy for the plaintiff?

***Id.*** (emphasis in original, citation omitted, and formatting altered).

---

[3] Although not acknowledged by the ***Frempong*** Court or the instant parties, we note that the Philadelphia Code explicitly provides a private right of action for tenants against non-compliant landlords. Phila. Code. § 9-3901(4)(f) ("*Private Right of Action*. Any tenant of any property subject to the provisions of this Chapter shall have the right to bring an action against the owner of such property to compel compliance with this Chapter").

[4] "The violation of a statute and the fact that some person suffered harm does not automatically give rise to a private cause of action in favor of the injured person. This court will not engraft a private cause of action onto the statute without further guidance from the General Assembly." ***Witthoeft***, 733 A.2d at 627.

The plaintiff, upon being properly challenged, bears the burden of proof of establishing the existence of a private right of action, whether explicit or implicit. *See id.* It is well-settled, however, that "[t]his Court will not act as counsel and will not develop arguments on behalf of an appellant." *Commonwealth v. Hardy*, 918 A.2d 766, 771 (Pa. Super. 2007) (citation omitted); *see Commonwealth v. Williams*, 782 A.2d 517, 532 (Pa. 2001) (Castille, J., concurring) (observing that the "Court is neither obliged, nor even particularly equipped, to develop an argument for a party. To do so places the Court in the conflicting roles of advocate and neutral arbiter.").

Instantly, Appellant has not explained how or why the Ordinance granted her any private right of action. *See* Appellant's Brief at 14-18. Further, she does not discuss the applicable rules of statutory construction to construe the Chester Ordinance. *See generally Witthoeft*, 733 A.2d at 626. Even though the controlling Philadelphia Ordinance in *Frempong* provides an explicit private right of action for tenants against noncompliant landlords, this Court did not discuss the private right of action in its disposition of the case. Therefore, Appellant's reliance on *Frempong* is misplaced under the circumstances of the instant case, particularly when Appellant has not construed the Chester Ordinance nor has Appellant argued or cited legal authority to establish any private right of action. *Compare* R.R. at 47a (quoting Ordinance), *with* Phila. Code. § 9-3901(4)(f) (expressly providing the tenant an explicit private right of action). Accordingly, absent any

developed argument by Appellant, we respectfully decline to address whether any private right of action exists for Appellant under the Ordinance as it would require this Court to act as her advocate. *See Hardy*, 918 A.2d at 771; *see also Williams*, 782 A.2d at 532. Accordingly, we hold that Appellant has not established the trial court erred when it dismissed Appellant's counterclaim. *See Am. Interior Constr.*, 206 A.3d at 512.

## Challenge to the Amount of Damages

In support of her second issue, Appellant raises three arguments. First, Appellant argues that Appellee is precluded from recovering any damages because it failed to comply with 68 P.S. § 512 of the Landlord and Tenant Act. Appellant's Brief at 18. Specifically, Appellant reasons that Appellee was required to provide her with a written, itemized list of damages under Section 512 before filing suit. *Id.* at 23-24 (citing *Nitardy v. Chabot*, 195 A.3d 941, 948 (Pa. Super. 2018) (*per curiam*)).

We note the relevant standard of review:

Our review in a non-jury case is limited to whether the findings of the trial court are supported by competent evidence and whether the trial court committed error in the application of law. We must grant the court's findings of fact the same weight and effect as the verdict of a jury and, accordingly, may disturb the non-jury verdict only if the court's findings are unsupported by competent evidence or the court committed legal error that affected the outcome of the trial. It is not the role of an appellate court to pass on the credibility of witnesses; hence we will not substitute our judgment for that of the factfinder. Thus, the test we apply is not whether we would have reached the same result on the evidence presented, but rather, after due consideration of the evidence which the trial court found credible, whether the trial court could have reasonably reached its conclusion.

*Frempong*, 209 A.3d at 1006 (citation omitted).

Section 250.512 states in relevant part as follows:

(a) Every landlord shall within thirty days of termination of a lease or upon surrender and acceptance of the leasehold premises, whichever first occurs, provide a tenant with a written list of any damages to the leasehold premises for which the landlord claims the tenant is liable. Delivery of the list shall be accompanied by payment of the difference between any sum deposited in escrow, including any unpaid interest thereon, for the payment of damages to the leasehold premises and the actual amount of damages to the leasehold premises caused by the tenant. Nothing in this section shall preclude the landlord from refusing to return the escrow fund, including any unpaid interest thereon, for nonpayment of rent or for the breach of any other condition in the lease by the tenant.

(b) Any landlord who fails to provide a written list within thirty days as required in subsection (a), above, shall forfeit all rights to withhold any portion of sums held in escrow, including any unpaid interest thereon, or to bring suit against the tenant for damages to the leasehold premises.

\*    \*    \*

(e) Failure of the tenant to provide the landlord with his new address in writing upon termination of the lease or upon surrender and acceptance of the leasehold premises shall relieve the landlord from any liability under this section.

68 P.S. § 250.512.

In *Nitardy*, the landlord argued to the trial court that because the tenants did not provide him with a forwarding address when they vacated the property on June 19, 2014, he could keep the tenants' security deposit under Section 250.512(e). *Nitardy*, 195 A.3d at 944, 949. The trial court declined to enforce Section 250.512(e) because the parties remained in email contact,

the tenants provided the landlord with a forwarding address on July 15, 2014, and therefore, the landlord had the information necessary to return the security deposit. *Id.* at 949. The landlord appealed, and this Court affirmed because the record supported the trial court's findings. *Id.* at 949-50.

Instantly, after careful review of the record, we agree with the trial court's finding that Appellant failed to provide Appellee with a forwarding address at the time she moved out of the residence. *See* R.R. at 235a; *see also* Trial Ct. Op., 1/22/20, at 4 (finding Mr. Fulves's testimony credible that Appellant failed to provide a forwarding address). To the extent Appellant relies on *Nitardy*, the facts of that case are distinguishable. Unlike the tenants in *Nitardy*, Appellant did not establish she stayed in email contact or provided a forwarding address upon terminating the lease. *See Nitardy*, 195 A.3d at 944, 949. Therefore, we hold that the trial court did not err in determining that Appellee could retain Appellant's security deposit to apply it against the cost of damages to the premises. *See Frempong*, 209 A.3d at 1006.

**Testimony of John Winter**

We summarize Appellant's second and third arguments together. By way of background, Appellant objected to Mr. Winter's testimony on the grounds that his damages testimony was unreliable because Mr. Winter inspected the property more than one year after Appellant moved out of the premises, and that damage to the carpets and floors could be explained by

fifteen years of wear and tear. ***See*** R.R. at 169a-70a. The trial court overruled Appellant's objection on the basis that it went to the weight of Mr. Winter's testimony. ***Id.*** at 170a.

On appeal, Appellant asserts the trial court erred by admitting the testimony of Mr. Winter. Appellant's Brief at 24. In her view, the trial court did not adequately consider that much of the damage alleged by Appellee was due to a "leaking roof and plumbing." ***Id.*** at 25. She highlights the discrepancy between Mr. Winter's calculation of damages as $31,233.58, and the amount of damages the trial court actually awarded. ***Id.*** Appellant maintains that "Mr. Winter could give no evidence as to how the property was damaged." ***Id.*** In Appellant's view, the trial court's "admission of this evidence was manifestly unreasonable" and an "abuse of discretion." ***Id.*** at 25-26. Appellant's third argument is that the amount awarded was against the weight of the evidence. ***Id.*** at 26. Appellant incorporates her prior arguments and reiterates that there was no testimony "as to how the property was damaged." ***Id.***

> Briefly, it is well-settled that
>
> the factfinder is free to believe all, part, or none of the evidence, and the Superior Court will not disturb the trial court's credibility determinations. Assessments of credibility and conflicts in evidence are for the trial court to resolve; this Court is not permitted to reexamine the weight and credibility determinations or substitute our judgments for those of the factfinder.

***Frempong***, 209 A.3d at 1006 (citation omitted).

[A]ppellate review of a weight claim is a review of the trial court's exercise of discretion, not of the underlying question of whether the verdict is against the weight of the evidence. Because the trial judge has had the opportunity to hear and see the evidence presented, an appellate court will give the gravest consideration to the findings and reasons advanced by the trial judge when reviewing a trial court's determination that the verdict is against the weight of the evidence. One of the least assailable reasons for granting or denying a new trial is the lower court's conviction that the verdict was or was not against the weight of the evidence and that a new trial should be granted in the interest of justice.

*In re Estate of Smaling*, 80 A.3d 485, 490 (Pa. Super. 2013) (*en banc*) (citation omitted and formatting altered).

After careful review of the record, the parties' arguments, and the trial court's opinion, we agree with the trial court's reasoning that Winters could testify as to the damages and condition of the premises. *See* Trial Ct. Op., 1/22/20, at 4-5 (summarizing the basis of Mr. Winter's testimony and stating it found Mr. Winter's testimony credible). We also discern no abuse of discretion in the trial court's denial of Appellant's motion for a new trial based on the weight of the evidence. *See Smaling*, 80 A.3d at 490. Accordingly, for the foregoing reasons, Appellant is not entitled to relief.

Judgment affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 11/5/20

- 14 -

**IN THE COURT OF COMMON PLEAS OF DELAWARE COUNTY, PENNSYLVANIA**
**CIVIL ACTION – LAW**

| | |
|---|---|
| **ASPEN ENTERPRISES, LLC** | No.    2017 – 10493 |
| v. | |
| **KIA THOMAS** | |

| | | |
|---|---|---|
| **Matthew Stone, Esquire** | – | **Counsel for the Plaintiff**<br>Aspen Enterprises, LLC |
| **John W. Nails, Esquire** | – | **Counsel for Defendant**<br>Kia Thomas |

**ANGELOS, J.**                                    **DATE:**      **July 9, 2019**

## DECISION

AND NOW, this 9th day of July 2019, following a bench trial held on May 2, 2019, and upon consideration of Plaintiff's Proposed Findings of Fact and Conclusions of Law, Defendant's Proposed Findings of Fact and Conclusion of law, and the attached Findings of Fact and Conclusions of Law and the attached Appendix, pursuant to Pa.R.C.P. 1038, it is hereby decided as follows:

1. The Court finds in favor of Plaintiff, Aspen Enterprises LLC, and against Defendant, Kia Thomas, in the amount of **six thousand, one hundred and thirty-three dollars and eighty-seven cents ($6,133.87).**

2. Pursuant to Pa.R.C.P. 227.4, the Office of Judicial Support shall enter in favor of Plaintiff, Aspen Enterprises LLC, and against Defendant, Kia Thomas, in the amount of **six thousand, one hundred and thirty-three dollars and eighty-seven cents ($6,133.87),** upon praecipe of Defendants if post-trial motions are not filed within ten (10) days of the

1

date of entry of this Decision or if post-trial motions are filed and the Court does not enter a dispositive order within one hundred twenty (120) days.

BY THE COURT:

_____
**SPIROS E. ANGELOS, J.**

2

## IN THE COURT OF COMMON PLEAS OF DELAWARE COUNTY, PENNSYLVANIA
## CIVIL ACTION – LAW

ASPEN ENTERPRISES, LLC

        v.

KIA THOMAS

No.    2017 – 10493

## FINDINGS OF FACT

### Procedural History

1. Plaintiff in the above-captioned matter is Aspen Enterprises, LLC (hereinafter referred to as "Plaintiff"), a business entity organized, incorporated, and existing under the Laws of the State of Delaware with its principal place of business in Pennsylvania located at 1118 Clover Lane, Chester City, Delaware County, Pennsylvania 19013. Complaint, 1/8/2010, ¶ 1.

2. Defendant in the above-captioned matter is Kia Thomas (hereinafter referred to as "Defendant"), an adult individual with an address of 905 Lincoln Terrace, Chester City, Delaware County, Pennsylvania 19013. Complaint, 1/8/2010, ¶ 2.

3. The above-captioned matter came before this Court via an Appeal from Award of Arbitration. Appeal from Award of Arbitrators, 10/05/2018.

4. A non-jury trial was conducted in the above-captioned matter on May 2, 2019. N.T. May 2, 2019.

### Testimony of John C. Winter

5. Mr. John C. Winter testified that he is an appraiser and public adjuster in the Commonwealth of Pennsylvania. N.T. May 2, 2019, p. 9.

3

6. Mr. Winter testified that he has worked for insurance companies handling both automobile and property claims and in 1980 he began working solely as a property adjuster. *Id.*

7. Mr. Winter testified that in 1995 he started working for an insurance restoration contractor and subsequently owned his own restoration company for seven (7) years. *Id.* at p. 10.

8. Mr. Winter testified that he is familiar with the subject property located at 931 Clover Lane, Chester, Pennsylvania 19013 (hereinafter referred to as the "premises"). *Id.*

9. Mr. Winter testified as to an estimate of damages he prepared on behalf of Plaintiff after inspecting the premises. N.T. May 2, 2019, p. 12; Exhibit P-7.

10. Mr. Winter testified that he completed the aforementioned inspection on January 12, 2019. *Id.*

11. Mr. Winter testified the total cost of required repairs to the premises to be thirty-one thousand, two hundred and thirty-three dollars and fifty-eight cents ($31,233.58). N.T. May 2, 2019, p. 13; Exhibit P-7.

12. Mr. Winter testified that he used a software platform known as "Xactimate" when preparing his report. *Id.*

13. Mr. Winter testified that the software platform estimates not only the cost of the materials for a locality, but also the cost of labor associated with the installation. *Id.*

14. Mr. Winter testified that his estimate was for both labor and materials. *Id.*

15. Mr. Winter testified that the software platform does not consider the purchase price of the property when calculating costs and repairs. N.T. May 2, 2019, p. 14; Exhibit P-7.

4

16. Mr. Winter testified that when he inspected the premises in 2019, it was in the same condition as the photos that were presented at trial, which purported to have been taken at or around the time that Defendant vacated the premises. N.T. May 2, 2019, pp. 14-15; Exhibit P-6.

17. Mr. Winter testified that he was not able to determine the cause of the damages in the premises. N.T. May 2, 2019, p. 16.

18. Mr. Winter testified that "much less" than half of the damage to the premises was caused by water damage. *Id.*

19. Mr. Winter testified that he could not affix a timeframe to when the damages to the premises occurred. *Id.* at p. 17.

20. Mr. Winter testified that he was unaware of the condition of the premises at the time that it was purchased by Plaintiff. *Id.* at p. 18.

21. Mr. Winter testified that he was unaware of who removed a "wallpaper border" from the premises. N.T. May 2, 2019, p. 20; Exhibit P-6.

22. Mr. Winter testified as to a chandelier that was removed from the premises. N.T. May 2, 2019, p. 21; Exhibit P-6.

### Testimony of Neal Fulves

23. Mr. Neal Fulves testified on behalf of Plaintiff. N.T. May 2, 2019, p. 25.

24. Mr. Fulves testified that he is the owner of Aspen Enterprises, LLC. *Id.*

25. Mr. Fulves testified that Aspen Enterprises owns the premises. *Id.* at p. 26.

26. Mr. Fulves testified that Plaintiff purchased the premises in May of 2017. *Id.*

27. Mr. Fulves testified that at the time of purchase, Defendant was residing at the premises. *Id.*

5

28. Mr. Fulves testified he conducted an inspection of the premises in April of 2017. *Id.* at p. 28.

29. Mr. Fulves testified that at the time of purchase, Defendant noted a concern of a potential water leak above the ceiling in the living room of the premises. *Id.* at p. 27.

30. Mr. Fulves testified that the aforementioned leak was not an issue with the roof, rather the bathroom located above the living room. *Id.*

31. Mr. Fulves testified that upon his inspection, he could not find any leak in the bathroom above the living room. *Id.*

32. Mr. Fulves testified that Defendant did not complain of any other issues at the time of the April 2017 inspection. *Id.* at p. 28.

33. Mr. Fulves testified as to a document that purported to be an assignment of the lease for the premises from the previous owner to Plaintiff. N.T. May 2, 2019, p. 31; Exhibit P-2.

34. Mr. Fulves testified that his signature was on the aforementioned assignment. *Id.*

35. Mr. Fulves testified as to a copy of the original lease between Defendant and the previous owner of the premises. N.T. May 2, 2019, p. 32; Exhibit P-1.

36. Mr. Fulves testified that the original lease provided for a monthly rent payment of eight hundred and fifty dollars ($750.00), which had since increased to eight hundred and fifty dollars ($850.00) pursuant to the lease addendum. N.T. May 2, 2019, p. 33; Exhibit P-1.

37. Mr. Fulves testified as to an addendum to the original lease that provided that Defendant would remain at the property after Plaintiff had purchased the premises. N.T. May 2, 2019, p. 33; Exhibit P-4.

38. Mr. Fulves testified that the addendum provided that the rent was eight hundred and fifty dollars ($850.00) per month. *Id.*

6

39. Mr. Fulves testified that the addendum provided that Defendant would remain at the premises until February 2018. *Id.*

40. Mr. Fulves testified as to a text message that he received from Defendant that indicated that the late fee for rent paid after the fifth of each month would be twenty-five dollars ($25.00). N.T. May 2, 2019, p. 34; Exhibit P-3.

41. Mr. Fulves testified that Defendant notified him of an issue with the toilet at the premises in September of 2017. N.T. May 2, 2019, p. 35; Exhibit P-5.

42. Mr. Fulves testified that he completed a repair on the aforementioned toilet one (1) day after it was reported by Defendant. *Id.*

43. Mr. Fulves testified that he took notice of the interior of the premises when he repaired the toilet in September of 2017. N.T. May 2, 2019, pp. 35-36.

44. Mr. Fulves testified that the condition of the interior was the same in September 2017 as it was when Plaintiff purchased the property. N.T. May 2, 2019, p. 36.

45. Mr. Fulves testified that the premises were "in excellent shape" at the time he entered the property in September 2017. *Id.* at p. 37.

46. Mr. Fulves testified that he received a text from Defendant about an issue of leaking in the roof above the front room of the premises. N.T. May 2, 2019, p. 38; Exhibit P-5.

47. Mr. Fulves testified that the nature of the complaint received on September 26, 2017 with the ceiling in the front room was cosmetic. *Id.*

48. Mr. Fulves testified that he notified Defendant that he wished to fix the roof above the front room first and then after that he would repaint the ceiling. N.T. May 2, 2019, p. 39.

49. Mr. Fulves testified as to having issues scheduling roofers to work on the premises, but that the roof over the front room was eventually fixed. *Id.*

7

50. Mr. Fulves testified Defendant paid rent for October 2017 in full. *Id.* at p. 40.

51. Mr. Fulves testified that Defendant partially paid rent for November 2017. *Id.*

52. Mr. Fulves testified that Defendant completed repairs on the premises without his permission. *Id.* at p. 41.

53. Mr. Fulves testified that after receiving a partial payment for the rent of November 2017, he contacted the constable to serve paperwork on the Defendant that detailed the late balance as well as a notice to Cure or Quit. *Id.* at p. 42.

54. Mr. Fulves testified that Defendant did not pay rent for December 2017, January 2018, or February 2018. *Id.*

55. Mr. Fulves testified that Defendant did not pay late fees for November 2017, December 2017, January 2018, or February 2018. *Id.*

56. Mr. Fulves testified as to a photograph taken April 23, 2017 that depicts the living room looking into the eat-in kitchen in the premises. N.T. May 2, 2019, p. 43; Exhibit P-6.

57. Mr. Fulves testified as to a photograph taken December 4, 2017 that depicted the same. *Id.*

58. Mr. Fulves testified as to differences between the April 23, 2017 and December 4, 2017 photographs to include: (1) a wallpaper border removed, (2) a wood strip of molding removed from the kitchen, and (3) damage to the drywall. *Id.*

59. Mr. Fulves testified as to trash and carpet stains in the front bedroom of the premises. N.T. May 2, 2019, p. 45.

60. Mr. Fulves testified that he discovered a cat on the premises, unattended, on December 1, 2017. *Id.*

61. Mr. Fulves testified that the premises cannot be accessed via the basement door if the door between the basement and the rest of the premises is closed. *Id.* at p. 47.

62. Mr. Fulves testified that on December 1, 2017, when the basement door to the outside was found open, both the interior basement door and the front door were closed and locked with no signs of forced entry. *Id.* at p. 48.

63. Mr. Fulves testified that the floor under the stained carpets had corresponding stains. *Id.* at p. 49.

64. Mr. Fulves testified that the alarm system on the premises was functioning in September of 2017. *Id.* at p. 51.

65. Mr. Fulves testified that the sensor for the alarm system had been removed on the front door on December 4, 2017 and that the system was beeping. *Id.*

66. Mr. Fulves testified as to fluorescent lightbulbs that were broken in the back bedroom of the premises. N.T. May 2, 2019, p. 52; Exhibit P-6.

67. Mr. Fulves testified that he observed shards of glass in the carpet of the back bedroom of the premises. *Id.*

68. Mr. Fulves testified that a dirty litterbox had been left behind by the tenant and that soiled litter had been dumped on the floor in the basement. *Id.*

69. Mr. Fulves testified that a toilet paper holder and toilet seat had been removed from the upstairs bathroom when he inspected the property on December 4, 2017. N.T. May 2, 2019, p. 55; Exhibit P-6.

70. Mr. Fulves testified that the blinds in the dining room had been damaged. N.T. May 2, 2019, p. 56; Exhibit P-6.

71. Mr. Fulves testified that molding was removed from the eat-in kitchen, that the floor was stained by the refrigerator, the blinds were broken, and that several floor tiles were damaged. N.T. May 2, 2019, p. 58; Exhibit P-6.

9

72. Mr. Fulves testified that the exterior light had been dismantled with its exterior glass broken. N.T. May 2, 2019, p. 59; Exhibit P-6.

73. Mr. Fulves testified that the exterior light was operational before he inspected the property on December 4, 2017. N.T. May 2, 2019, p. 60.

74. Mr. Fulves testified that the blinds were damaged throughout the house with the exception of the front room, which was only missing parts. *Id.*

75. Mr. Fulves testified as to grease residue that was left in the kitchen and never cleaned. N.T. May 2, 2019, p. 61; Exhibit P-6.

76. Mr. Fulves testified as to damage done to the doors in the premises. N.T. May 2, 2019, p. 62.

77. Mr. Fulves testified as to damage done to the walls when shelves were removed. N.T. May 2, 2019, p. 63; Exhibit P-6.

78. Mr. Fulves testified as to an armoire that had been removed from its position and knocked over in the front bedroom. N.T. May 2, 2019, p. 64; Exhibit P-6.

79. Mr. Fulves testified that on December 1, 2017, the armoire had not been knocked over. *Id.*

80. Mr. Fulves testified that on December 4, 2017, the cat had been removed from the premises. N.T. May 2, 2019, p. 65.

81. Mr. Fulves testified that the doorjam surrounding the exterior basement door was damaged sometime after December 1, 2017. N.T. May 2, 2019, pp. 65-66; Exhibit P-6.

82. Mr. Fulves testified that as of November 30, 2017, the exterior light on the premises was working. N.T. May 2, 2019, p. 66; Exhibit P-6.

83. Mr. Fulves testified that the bathtub in the premises had been painted with regular "house paint" and that paint had been applied to the fixtures and drain and begun to chip. N.T. May 2, 2019, p. 68.

10

84. Mr. Fulves testified that carpet had been removed from the bottom step of the stairs in the premises. N.T. May 2, 2019, p. 70; Exhibit P-6.

85. Mr. Fulves summarily testified that when he inspected the property in April of 2017, the following conditions were not present:

    a.  Soiled carpets

    b.  Broken glass in the carpet

    c.  Carpet removed from the bottom step of the stairs

    d.  Toppled furniture

    e.  Broken door jams

    f.  Insufficient repairs

    g.  Insufficient repairs to windows

    h.  Broken light fixtures

    i.  Missing alarm sensors and/or components

    j.  Missing paneling and/or molding

N.T. May 2, 2019, pp. 71-72.

86. Mr. Fulves testified that the aforementioned conditions were not present at the time that he repaired the toilet in September of 2017. N.T. May 2, 2019, p. 72.

87. Mr. Fulves testified that it is his understanding that the aforementioned damages/conditions occurred sometime between September 2017 and December 2017. *Id.*

88. Mr. Fulves testified that the costs of the repairs have precluded him from fixing any of the damages. *Id.*

89. Mr. Fulves testified that when he purchased the premises, he financed it and is therefore making monthly mortgage payments. *Id.*

90. Mr. Fulves testified that the Defendant failed to provide him with a forwarding address after she moved out of the premises. *Id.*

11

91. Mr. Fulves testified that the condition of the premises at the time Defendant leased the property was in "good order, repair, and [was] safe, clean,...[and in] sensible condition". *Id.* at p. 74.

92. Mr. Fulves testified that the lease memorialized the stipulation that the Defendant had examined the premises and found them in good order, repair, and tenantable. N.T. May 2, 2019, p. 74; Exhibit P-1.

93. Mr. Fulves testified that the lease provided that the Defendant would "at [her] sole expense, keep and maintain the leased premises and appurtenances in good and sanitary condition and repair during the term of the lease and any renewal thereof." *Id.*

94. Mr. Fulves testified that he did not receive a disclosure statement from the previous owner of the premises when he purchased the premises. N.T. May 2, 2019, p. 79; Exhibit D-7.

95. Mr. Fulves testified that there were no provisions in the lease that explicitly permitted the assignment of the lease. N.T. May 2, 2019, p. 81; Exhibit P-1.

96. Mr. Fulves also testified that there were no provisions in the lease that explicitly prohibited the assignment of the lease. *Id.*

97. Mr. Fulves testified that he understood that after the termination of the original one (1) year period of the lease, it converted to a month-to-month lease. N.T. May 2, 2019, p. 82; Exhibit P-1.

98. Mr. Fulves testified that he had not had a conversation with the previous landlord regarding assigning the addendum to the lease to Mr. Fulves. N.T. May 2, 2019, p. 84; Exhibit P-4.

99. Mr. Fulves testified that Defendant verbally agreed to stay at the premises after Mr. Fulves purchased the premises. N.T. May 2, 2019, p. 85; Exhibit P-4.

12

100. Mr. Fulves testified that he received a letter from the city of Chester regarding his failure to obtain an occupancy permit for the premises sometime after November 17, 2017 and therefore after he had sent Defendant the Notice to Vacate the premises. N.T. May 2, 2019, p. 87; Exhibit D-2.

101. Mr. Fulves testified that he did not and never has obtained an occupancy permit for the premises. N.T. May 2, 2019, p. 89.

102. Mr. Fulves testified that he paid a two hundred and fifty dollar ($250.00) fine as a result of his failure to obtain an occupancy permit. N.T. May 2, 2019, p. 90.

103. Mr. Fulves testified that at the time of his initial inspection, there was no evidence of water damage in the sunroom of the premises. N.T. May 2, 2019, p. 92.

104. Mr. Fulves testified that he knew that the new floor in the dining room was installed by the previous landlord. N.T. May 2, 2019, p. 95.

105. Mr. Fulves testified that he did not know who purchased the fluorescent bulbs or painted the bathtub. *Id.*

106. Mr. Fulves testified that he did not know who carpeted the premises. *Id.* at p. 96.

107. Mr. Fulves testified that the carpet is attached to the floor throughout the premises except in the front bedroom, back bedroom, dining room, the eat-in kitchen, and the kitchen. *Id.*

108. Mr. Fulves testified that he did not know who installed the light fixture in the dining room. *Id.* at p. 98.

109. Mr. Fulves testified that he would not have bought the premises if it was in its current condition as evidenced by the photos taken in December of 2017. N.T. May 2, 2019, p. 109.

13

## Testimony of Kia Thomas

110. Ms. Kia Thomas testified that she moved into the premises in 2002. N.T. May 2, 2019, p. 114.

111. Ms. Thomas testified that she was still a tenant at the premises when Plaintiff purchased it in May of 2017. *Id.*

112. Ms. Thomas testified that the premises was in good condition when she moved in in 2002, referencing the clause in the lease that indicated that the property was in good order, repair, and tenantable. N.T. May 2, 2019, p. 115; Exhibit P-1.

113. Ms. Thomas testified that she agreed that it was her responsibility to maintain the premises in good repair at the time of signing the lease. *Id.*

114. Ms. Thomas testified that she knew that Plaintiff had become the new owner of the premises and proceeded to pay rent to him pursuant to the lease that was originally signed by the previous landlord. N.T. May 2, 2019, p. 117.

115. Ms. Thomas testified that she paid eight hundred and fifty dollars ($850.00) to Plaintiff for rent for the months of June 2017, July 2017, August 2017, September 2017, and October 2017 because of an agreement with the housing authority. N.T. May 2, 2019, p. 121.

116. Ms. Thomas testified that there was a five (5) day grace period on rent payments after which a twenty-five dollar ($25.00) late fee would be assessed. N.T. May 2, 2019, p. 124; Exhibit P-3.

117. Ms. Thomas testified that the toilet in the upstairs bathroom overflowed days after Plaintiff fixed it. N.T. May 2, 2019, p. 126.

118. Ms. Thomas testified that the carpets were not soiled in April of 2017. N.T. May 2, 2019, p. 134.

119. Ms. Thomas testified that she never used the alarm system in the premises. *Id.* at p. 135.

14

120. Ms. Thomas testified there was a toilet seat attached to the toilet when she vacated the premises. *Id.* at p. 136.

121. Ms. Thomas testified that the wall in the bathroom was initially wallpapered, which covered the cut-out for the toilet paper holder. *Id.* at pp. 136-137.

122. Ms. Thomas testified that, when she left the premises on November 30, 2017, she and her son were unable to find their cat. *Id.* at p. 139.

123. Ms. Thomas testified that between May 2, 2017 and November 30, 2017, she did no damage to the premises. *Id.* at p. 140.

124. Ms. Thomas testified that she took the chandelier with her when she vacated the premises. N.T. May 2, 2019, p. 144; Exhibit P-6.

125. Ms. Thomas testified that she could not recall if any lightbulbs were broken in the back room when she vacated the premises. N.T. May 2, 2019, p. 150; Exhibit P-6.

126. Ms. Thomas testified she did not take the litterbox with her when she vacated the premises. N.T. May 2, 2019, p. 152.

127. Ms. Thomas testified that she was unaware of anything regarding the blinds being taken down and damaged throughout the premises. *Id.* at pp. 153-155.

128. Ms. Thomas testified that she left trash in the kitchen when she vacated the premises. *Id.* at p. 155.

129. Ms. Thomas testified that she did not damage the floor in the kitchen when she vacated the premises. *Id.* at p. 156.

130. Ms. Thomas testified that she left a refrigerator behind at the premises. *Id.* at p. 157.

131. Ms. Thomas testified that damage done to a door at the premises was "probably" done before she vacated. N.T. May 2, 2019, p. 159; Exhibit P-6.

15

132. Ms. Thomas testified that she never attempted to make any repairs to any windows in the premises. *Id.*

133. Ms. Thomas testified that the armoire was still standing when she moved vacated the premises. N.T. May 2, 2019, p. 161; Exhibit P-6.

134. Ms. Thomas testified that her brothers helped her move her belongings out of the premises and that she did not supervise them throughout the process. N.T. May 2, 2019, p. 163.

135. Ms. Thomas testified that if her brothers had damaged the property, she would not have seen them do so. *Id.*

136. Ms. Thomas testified that her brothers knew the circumstances that required her to vacate the premises. *Id.* at p. 164.

137. Ms. Thomas testified that the paint in the bathtub was applied by an employee of the previous owner. *Id.* at p. 166.

138. Ms. Thomas testified that the soiling of the carpet in the back bedroom looked "fresh." N.T. May 2, 2019, p. 166; Exhibit P-6.

139. Ms. Thomas testified that the section of carpet removed from the steps was removed by the previous owner. N.T. May 2, 2019, p. 167.

140. Ms. Thomas testified there was a light fixture in the dining room when she moved into the premises. *Id.* at p. 168.

141. Ms. Thomas testified that she did not pay the entirety of the rent due and owing for November 2017. *Id.*

142. Ms. Thomas testified that she did not pay rent for December 2017, January 2018, or February 2018. *Id.* at p. 169.

16

143. Ms. Thomas testified that she did not pay any late fees for November 2017, December 2017, January 2018, or February 2018. *Id.*

144. Ms. Thomas testified that the lease did not allow for pets to be kept on the premises. N.T. May 2, 2019, p. 169; Exhibit P-1.

145. Ms. Thomas testified as to the City of Chester Ordinance that requires an occupancy permit and precludes the collection of rent during any period of non-compliance. N.T. May 2, 2019, p. 173; Exhibit D-1.

146. Ms. Thomas testified that she incurred the following expenses to repair the ceiling of the front room in the premises:

| | | |
|---|---|---|
| Home Depot (Materials) | - | $38.01 |
| Repair | - | $40.00 |
| **Total:** | - | **$78.01** |

N.T. May 2, 2019, p. 174; Exhibit D-3.

147. Ms. Thomas testified that she deducted the costs enumerated in *paragraph 146* of these findings of fact from her rent for the month of November, 2017. N.T. May 2, 2019, p. 176.

148. Ms. Thomas testified that the attached carpet in the premises had been there since she moved in. *Id.* at pp. 177-179.

149. Ms. Thomas testified as to water damage on the ceiling of the living room which, to her knowledge, was never repaired. *Id.* at p. 182.

150. Ms. Thomas testified that water damage occurred to the ceiling of the living room after Plaintiff purchased the property. *Id.* at p. 183.

151. Ms. Thomas testified that the carpet rolled up in the front bedroom was her own that she left behind and that the floor underneath was substantially the same as when she moved in. N.T. May 2, 2019, pp. 186-187; Exhibit P-6.

17

152. Ms. Thomas testified that nothing had been done to the carpet throughout the house in the fifteen years that she had lived at the premises. *Id.*

153. Ms. Thomas testified that, at the time of the inspection in April 2017, the carpet had been removed from the bottom of the stairs. *Id.* at p. 188.

154. Ms. Thomas testified that she purchased the blinds in the dining room when she moved in. N.T. May 2, 2019, p. 190; Exhibit P-6.

155. Ms. Thomas testified that there were no blinds in the premises when she moved in, but that she recalled there being shades in the windows. N.T. May 2, 2019, p. 191.

156. Ms. Thomas testified that she did not damage the door going into the basement. *Id.* at p. 196.

157. Ms. Thomas testified that the gate on the basement door belonged to her. *Id.* at p. 197.

158. Ms. Thomas testified that the light on the front of the house never worked and that Plaintiff kept the light lit on the property next door. *Id.* at p. 197.

159. Ms. Thomas testified that she paid a seven hundred and fifty dollar ($750.00) security deposit when she moved in which was never returned to her. *Id.* at p. 198.

160. Ms. Thomas testified that water damage and roof leaks were constant issues that arose during her fifteen (15) years living at the premises. *Id.* at p. 201.

161. Ms. Thomas testified as to numerous inspections that indicated that damage was being done to floors in the premises by water leaking from the plumbing and roof. *Id.* at p. 202.

162. Ms. Thomas testified as to having to put out buckets to catch water as it dripped from the ceiling in the premises. *Id.* at p. 204.

163. Ms. Thomas testified that the carpet that she brought with her and put in the premises was not soiled when she put it down. *Id.* at p. 211.

18

164. Ms. Thomas testified that she did not know the source of the stains on the carpets that she brought to the premises. *Id.* at p. 212.

165. Ms. Thomas testified that the previous landlord had given her permission to install her own chandelier in the dining room. *Id.* at p. 216.

166. Ms. Thomas testified that she did not put the original light fixture back after removing the chandelier from the dining room. *Id.* at p. 214.

167. Ms. Thomas testified that, contrary to previous testimony where she said the previous landlord had not made any repairs to the premises, the previous landlord had replaced the dining room floor and painted throughout the premises. *Id.* at p. 215.

168. Ms. Thomas testified that she could not be sure that the previous landlord had not made repairs or replaced the roof on the premises. *Id.*

## CONCLUSIONS OF LAW

### The Relationship of the Parties

1. The Court finds that Plaintiff became owner of the premises on May 17, 2017.

2. The Court finds that the Defendant was residing, and had so resided for fifteen years prior, at the premises.

3. The Court finds that after the initial year on the original lease, the lease converted to a month-to-month lease. Exhibit P-1.

4. The Court finds that upon purchase of the premises, the lease between Defendant and the previous landlord was assigned to the Plaintiff.

5. The actions of the parties after the sale of the property, including Defendant's continued practice of paying the eight hundred and fifty dollar ($850.00) monthly rent payment to Plaintiff, further support the validity of the assignment of the lease.

6. The Court finds that, as a result of Defendant's assent, all rights and responsibilities among the parties transferred to the Plaintiff and Defendant.

### Damages to the Premises

7. The Court finds that Defendant was required to "keep and maintain the leased premises and appurtenances in good and sanitary condition and repair during the term of [the] lease and any renewal thereof. Exhibit P-1, ¶ 13.

8. The Court finds Plaintiff was responsible for "[m]ajor maintenance and repair of the leased premises, not due to [Defendant's] misuse, waste, or neglect, or that of [her] employee, family, agent, or visitor." *Id.*

9. The Court finds that Defendant was liable for any damage to the premises proved to be caused by Defendant and/or her agents between May 2, 2017 and December 4, 2017.

20

10. The Court finds the testimony of John C. Winter to be credible as to the repairs that are required to be done to the premises.[1]

11. The Court finds that John C. Winter was unable to testify as to the causation of the damages to the property.

12. The Court finds that many of the damages complained of by Plaintiff were caused by water damage outside of the control of Defendant, which is supported by uncontradicted testimony of the Defendant that the roof was leaking in multiple areas.

13. Following review of the report of Plaintiffs Expert and the testimony presented at trial, the Court finds that Defendant is liable for the costs to repair the following damages[2]:

| | | |
|---|---|---|
| a. | Damage to Rear Bedroom | $853.10 |
| b. | Damage to Middle Bedroom | $473.33 |
| c. | Damage to Front Bedroom | $784.90 |
| d. | Damage to Sun Porch | $1,126.99 |
| e. | Damage to Living Room | $135.26 |
| f. | Damage to Dining Room | $401.82 |
| g. | Damage to Eat-In Kitchen | $1,265.95 |
| h. | Damage to Kitchen | $361.91 |
| i. | Damage to Basement | $678.05 |
| j. | Damage Itemized under "Garage" | $225.00 |
| k. | Damage Itemized Under "Miscellaneous" | $577.56 |
| | **Total Damages** | **$6,883.87** |

14. The Court finds that Plaintiff is still in possession of Defendant's seven hundred and fifty dollar ($750.00) security deposit and that it may be applied against the damages caused by Defendant.

---

[1] The Court notes that John C. Winter was unable to testify as to the cause of any the damages, so the Court was required to weigh the testimony of Defendant and Plaintiff in determining what damages were caused by Defendant.
[2] The gravity of the damages sought by Plaintiff is not lost on this Court, and therefore each line-item of Plaintiff's Expert report is addressed *ad seriatum* in the attached Appendix A entitled "Itemized Damages."

21

15. Accordingly, the Court finds in favor of Plaintiff and against Defendant in the amount of **six thousand, one hundred and thirty-three dollars and eighty-seven cents ($6,133.87)**, comprised of the above enumerated damages less the security deposit retained by Plaintiff.

## Unpaid Rent

16. The Court finds that as a result of the Notice to Cure or Quit served upon the Defendant on November 17, 2017, the subject lease was terminated.

17. Accordingly, Defendant cannot be held liable for rents owed for December 2017, January 2018, and February 2018 or any associated late fees.

18. Therefore, the Court finds in favor of Defendant and against Plaintiff in no amount in regard to the unpaid rent and late fees for December 2017, January 2018, and February 2019.

## Chester City Ordinance No. 9 of 2016

19. The Court finds that as a consequence of the Notice to Quit or Cure, discussed *supra*, Plaintiff is unable to assert a claim for rent or late fees for the months of December 2017, January 2017, or February 2017 and therefore Defendant's assertion that Plaintiff could not collect rent for these months is moot.

20. The Court finds that as a consequence of the operation of Chester city Ordinance No. 9 of 2016 that Plaintiff may not seek the remaining unpaid rent or late fee for November 2017.

21. Therefore, the Court finds in favor of Defendant and against Plaintiff in no amount in regard to the allegation that Defendant owes any backed rent or late fees to Plaintiff for November 2017.

22

## Defendant's Counter-Claim

22. The Court finds that Plaintiff still possesses Defendant's seven hundred and fifty dollar ($750.00) security deposit.

23. The Court finds that as a consequence of damages for which Defendant is liable, Plaintiff is entitled to retain the security deposit.

24. Therefore, the Court finds in favor of Plaintiff and against Defendant in regard to Defendant's counterclaim for return of her security deposit and accordingly, Defendant's request for treble damages is moot.

**BY THE COURT:**

_____

**SPIROS E. ANGELOS, J.**

23

# APPENDIX A – ITEMIZED DAMAGES

a.  Rear Bedroom

|  |  |  |
|---|---|---|
| i. | Drywall Repair | $0.00 |
| ii. | Seal Walls | $0.00 |
| iii. | Paint Walls & Ceiling | $0.00 |
| iv. | R&R Wallpaper Border | $0.00 |
| v. | R&R Existing Carpet | $41.80 |
| vi. | Sand and seal wood floor | $621.30 |
| vii. | Add for dustless floor sanding | $190.00 |
| viii. | Windows – Vinyl Repair | $0.00 |
| ix. | Seal & Paint Window Sill | $0.00 |
| x. | Light bulb | $0.00 |
| xi. | Paint door slab | $0.00 |
| xii. | Paint door/window trim | $0.00 |
| xiii. | Paint baseboard | $0.00 |
| xiv. | **Room Subtotal** | **$853.10** |

b.  Hallway[3]

|  |  |  |
|---|---|---|
| i. | Drywall Repair | $0.00 |
| ii. | Seal Walls | $0.00 |
| iii. | Paint walls | $0.00 |
| iv. | R&R Carpet | $0.00 |
| v. | R&R Replace Carpet | $0.00 |
| vi. | R&R Replace Carpet Pad | $0.00 |
| vii. | R&R Exterior Light Fixture | $0.00 |
| viii. | Paint door slab | $0.00 |
| ix. | Paint door/window trim | $0.00 |
| x. | Paint baseboard | $0.00 |
| xi. | Paint balustrade[4] | $0.00 |
| xii. | **Room Subtotal** | **$0.00** |

---

[3] Plaintiff failed to present evidence regarding damage done to the carpet in the upstairs hallway. While Plaintiff's expert report indicates that the carpet will need to be replaced, no facts as to the cause of the damage were presented.

[4] Testimony regarding the condition of the balustrade was conflicted. Plaintiff alleged no damage had been done to the balustrade when he purchased the property whereas Defendant testified that the workers of the Plaintiff and/or the previous landlord had caused the damage.

24

c. Middle Bedroom

| | | |
|---|---|---:|
| i. | Drywall Repair | $0.00 |
| ii. | Seal the walls | $0.00 |
| iii. | Paint walls | $0.00 |
| iv. | R&R Existing Carpet | $23.19 |
| v. | Sand and seal wood floor | $344.72 |
| vi. | Add for dustless floor sanding | $105.42 |
| vii. | Windows – Vinyl Repair | $0.00 |
| viii. | Seal and paint window sill | $0.00 |
| ix. | Light bulb | $0.00 |
| x. | Paint door slab | $0.00 |
| xi. | Paint door/window | $0.00 |
| xii. | Paint baseboard | $0.00 |
| xiii. | **Room Subtotal** | **$473.33** |

d. Bathroom[5]

| | | |
|---|---|---:|
| i. | Seal the walls | $0.00 |
| ii. | Paint walls | $0.00 |
| iii. | Seal & paint window sill | $0.00 |
| iv. | Paint door slab | $0.00 |
| v. | Paint door/window | $0.00 |
| vi. | Paint baseboard | $0.00 |
| vii. | Repair access panel frame | $0.00 |
| viii. | Seal & paint trim | $0.00 |
| ix. | Refinish bathtub[6] | $0.00 |
| x. | R&R Light Bar – 3 Lights | $0.00 |
| xi. | **Room Subtotal** | **$0.00** |

e. Front Bedroom

| | | |
|---|---|---:|
| i. | Drywall Repair | $0.00 |
| ii. | Seal the walls and ceiling | $0.00 |
| iii. | R&R Remove Existing Carpet | $38.46 |
| iv. | Sand and seal wood floor | $571.63 |
| v. | Add for dustless floor sanding | $174.81 |
| vi. | Windows – Vinyl Repairs | $0.00 |
| vii. | Seal & Paint Window sill | $0.00 |
| viii. | **Room Subtotal** | **$784.90** |

[5] Plaintiff asserted that the toilet paper holder in the bathroom had been damaged by Defendant, but no evidence regarding value or damages to replace/repair the holder were offered at trial. The Expert Report is similarly silent on this issue.

[6] The testimony of Defendant was that workers for the previous landlord had painted the tub using standard house paint. Plaintiff was unable to testify as to whether the tub's condition reflected the same condition as when he was in the premises in September 2017 or when he purchased the property.

25

f.  Stairwell
  i.  Drywall repair                                    $0.00
  ii.  Paint walls                                      $0.00
  iii.  Repair Balustrade                               $0.00
  iv.  Paint Balustrade                                 $0.00
  v.  R&R Remove Carpet[7]                              $0.00
  vi.  R&R replace carpet                               $0.00
  vii.  R&R replace carpet pad                          $0.00
  viii.  Step charge for "waterfall" installation       $0.00
  ix.  **Room Subtotal**                               **$0.00**

g.  Sun Porch ("Sun Room" or "Front Room")
  i.  R&R Acoustic ceiling tile                         $0.00
  ii.  R&R Cove molding                                 $0.00
  iii.  Paint cove molding                              $0.00
  iv.  Seal the walls                                   $0.00
  v.  Paint the walls                                   $0.00
  vi.  Door repair                                      $65.00
  vii.  Electrical – Replace Alarm Sensor[8]            $0.00
  viii.  Window blinds[9]                               $885.48
  ix.  Paint door slab                                  $26.08
  x.  Paint door/window trim                            $150.43
  xi.  Paint baseboard                                  $0.00
  xii.  R&R remove carpet[10]                           $0.00
  xiii.  R&R replace carpet                             $0.00
  xiv.  R&R replace Carpet pad                          $0.00
  xv.  **Room Subtotal**                               **$1,126.99**

---

[7] In regards to the alleged damages to the carpeting on the stairs, Plaintiff offered no testimony regarding the condition of said carpet outside of the allegation that Defendant had torn the carpet off the bottom step. This testimony was rebutted by Defendant. Plaintiff presented no evidence regarding the condition of the carpet when he purchased the property as well as failed to allege any soiling of the carpet.

[8] Defendant testified that during her time living at the premises, the alarm system was never operational.

[9] Defendant testified that when she moved into the premises, she recalled "shades" being present in the windows of the premises. However, there is no testimony regarding what windows had these "shades" and what rooms did not to indicate what "shades" she replaced with blinds versus where she hung blinds where there were none before.

[10] The Court did not hear testimony regarding specific damage done to the sun porch carpet. Defendant alleged and Plaintiff admitted that the roof above the sun porch was leaking and therefore, damage to the carpet in the room may have been water damage.

26

h. Living Room

| | | |
|---|---|---|
| i. | Drywall repair | $0.00 |
| ii. | R&R acoustic ceiling tile[11] | $0.00 |
| iii. | R&R cove molding | $98.32 |
| iv. | Paint cove molding | $36.94 |
| v. | Seal the walls | $0.00 |
| vi. | Paint the walls | $0.00 |
| vii. | Paint door/window trim | $0.00 |
| viii. | Paint baseboard | $0.00 |
| ix. | R&R Remove Carpet | $0.00 |
| x. | R&R Replace Carpet | $0.00 |
| xi. | R&R replace carpet pad | $0.00 |
| xii. | Clean fireplace face & mantel[12] | $0.00 |
| xiii. | **Room Subtotal** | **$135.26** |

i. Dining Room

| | | |
|---|---|---|
| i. | Drywall repair | $0.00 |
| ii. | R&R acoustic ceiling tile | $0.00 |
| iii. | R&R crown molding | $0.00 |
| iv. | R&R chandelier[13] | $0.00 |
| v. | Paint crown molding | $0.00 |
| vi. | Thermostat | $0.00 |
| vii. | Seal the walls | $0.00 |
| viii. | Paint the walls | $0.00 |
| ix. | Repair doors | $150.00 |
| x. | Paint door slab | $104.32 |
| xi. | Paint door | $64.47 |
| xii. | Paint baseboard | $0.00 |
| xiii. | Clean floor – Heavy | $83.03 |
| xiv. | **Room Subtotal** | **$401.82** |

---

[11] Defendant testified as to the existence of water damage in the living room in April 2017.

[12] No testimony was offered with regard to the condition of the fireplace and/or mantel.

[13] Defendant testified that she permission from the previous landlord to remove the previously installed light fixture and install her own chandelier in its place. There was no conflicting evidence presented that Defendant was indeed the owner of the chandelier. Defendant failed to reinstall the previous light fixture upon departure, but Plaintiff failed to provide any estimate of cost to install a comparable light as was previously in the dining room upon which the Court could award damages.

j. Eat-In Kitchen

| | | |
|---|---|---|
| i. | Drywall repair | $0.00 |
| ii. | Seal the walls | $0.00 |
| iii. | Paint the walls | $0.00 |
| iv. | Light fixture – detach and reset | $0.00 |
| v. | Paint door | $85.96 |
| vi. | R&R window blind | $442.74 |
| vii. | Paint chair rail | $0.00 |
| viii. | Seal & paint baseboards | $0.00 |
| ix. | Remove tear out vinyl | $142.40 |
| x. | R&R Underlayment | $239.20 |
| xi. | Vinyl tile | $317.68 |
| xii. | Remove and reset refrigerator | $38.00 |
| xiii. | **Room Subtotal** | **$1,265.95** |

k. Kitchen

| | | |
|---|---|---|
| i. | Drywall repair | $0.00 |
| ii. | Seal the ceiling | $0.00 |
| iii. | Paint the ceiling | $0.00 |
| iv. | Light fixture – detach and reset | $0.00 |
| v. | Paint door | $64.47 |
| vi. | R&R window blind | $147.58 |
| vii. | Paint cabinetry | $0.00 |
| viii. | Clean range – exterior | $21.98 |
| ix. | R&R Countertop | $0.00 |
| x. | R&R Sink sprayer | $0.00 |
| xi. | R&R vinyl cove | $0.00 |
| xii. | Remove Tear out vinyl and underlay | $26.06 |
| xiii. | R&R Underlayment | $43.74 |
| xiv. | Vinyl tile | $58.08 |
| xv. | **Room Subtotal** | **$361.91** |

l.  Mudroom[14]

|  | | |
|---|---|---|
| i. | Seal floor | $0.00 |
| ii. | R&R drywall | $0.00 |
| iii. | R&R acoustic ceiling tile furring | $0.00 |
| iv. | R&R acoustic ceiling tile | $0.00 |
| v. | R&R Porcelain light | $0.00 |
| vi. | R&R paneling | $0.00 |
| vii. | Paint door slab | $0.00 |
| viii. | Paint door | $0.00 |
| ix. | R&R vinyl cove | $0.00 |
| x. | Remove tear out vinyl | $0.00 |
| xi. | R&R underlayment | $0.00 |
| xii. | Vinyl tile | $0.00 |
| xiii. | **Room Subtotal** | $0.00 |

m.  Basement

|  | | |
|---|---|---|
| i. | R&R porcelain light | $0.00 |
| ii. | R&R wood door | $151.55 |
| iii. | Finish hardware labor min. | $125.26 |
| iv. | R&R door opening | $140.90 |
| v. | Masonry labor min. | $165.20 |
| vi. | Paint door trim | $42.98 |
| vii. | Paint door slab | $52.16 |
| viii. | **Room Subtotal** | **$678.05** |

n.  Garage[15]

|  | | |
|---|---|---|
| i. | Remove items left behind by tenant | $225.00 |
| ii. | **Room Subtotal** | **$225.00** |

o.  Exterior

|  | | |
|---|---|---|
| i. | R&R Exterior Light[16] | $0.00 |
| ii. | **Room Subtotal** | **$0.00** |

---

[14] The record was devoid of any specific testimony with regard to damages in a "mudroom" in the premises.

[15] No testimony was offered regarding belongings found in the garage. However, Defendant had been in sole possession of the property for fifteen years and Plaintiff's expert testified that all of the expenses listed in his report were required to repair damage to the property. It follows that the items in the garage were the belongings of the Defendant and therefore she is liable for the cost to remove them.

[16] Conflicting testimony was presented at trial where Plaintiff indicated that the light had been in working order and Defendant stated that it did not. Defendant testified that Plaintiff had left the exterior light on at the next door property to illuminate the area that would have been dark because the exterior light on the premises was not operational. The Court reviewed the photograph that Plaintiff asserted in their proposed findings of fact showed that the exterior light on the premises was operational, but found the photograph to be inconclusive.

29

p. Miscellaneous
    i. Single axle dump truck      $577.56
   ii. General demolition[17]      $0.00
  iii. **Room Subtotal**      **$577.56**

---

[17] While Plaintiff's testimony did testify as to the work required to remove Defendant's belongings, as well as the need to dispose of the soiled carpets, there was no testimony regarding "general demolition costs" or what they may entail and therefore the Court does not award damages for them.

IN THE COURT OF COMMON PLEAS OF DELAWARE COUNTY, PENNSYLVANIA
CIVIL ACTION- LAW

ASPEN ENTERPRISES, LLC         :      NO. 2017-010493

                : 

         v.               : 

                : 

KIA THOMAS             : 

## OPINION

**ANGELOS, J.**                                               January 22, 2020

## Procedural and Factual History

On November 14, 2019, this Court entered an Order denying the Defendant Kia Thomas's Motion for New Trial and/or Arrest of Judgment. That Motion had been filed in response to this Court's July 9, 2019 Decision entered after a non-jury trial conducted between Plaintiff landlord Aspen Enterprises, LLC, and Defendant tenant, Kia Thomas. This Court's Decision awarded the Plaintiff the sum of $6,133.87 for damages to the premises sustained as a result the tenant's occupancy. The Decision further denied the Defendant's counterclaim for failure to return the security deposit.

At trial, Mr. Neal Fulves testified in his capacity as the principal of Aspen Enterprises LLC., and Plaintiff called John C. Winter, a former insurance adjuster and currently a restoration contractor as a damage expert. Plaintiff introduced seven (7) exhibits into the record which consisted of the original lease between the parties, an assignment of the lease, text messages, a lease addendum, photographs, and a damage estimate prepared by John C. Winter, LLC. Plaintiff also called Kia Thomas as on cross-examination. The Defendant testified on her own behalf and

presented six (6) exhibits into the record consisting of City of Chester Ordinance No. 9, dated April 27, 2016, City of Chester correspondence dated November 17, 2017 notifying Plaintiff that the rental premises were lacking a certificate of occupancy, a repair receipt, photographs, an agreement of sale for the premises and a notice to quit.

After the May 2, 2019 non-jury proceeding was completed, able counsel for both parties submitted detailed proposed findings of fact and conclusions of law. On July 9, 2019 this Court entered its Decision which included one hundred sixty-eight (168) findings of fact, twenty-four (24) conclusions of law, and an appendix which detailed the damages awarded in the amount of $6,883.87 to the Plaintiff.

## Statement of Matters Complained of on Appeal

Kia Thomas timely complied with this Court's Order to file a Statement of Matters Complained on Appeal pursuant to PA. R. P. 1925(b)(1) and submitted that this Court erred in dismissing her counter-claim for recovery of rent paid during the time Plaintiff failed to possess an Occupancy Permit for the premises and for denying the counter-claim seeking return of the security deposit. The Defendant further complained that the testimony of John C. Winter should have been precluded due to his inspection taking place on January 12, 2019, a year after the Complaint had been filed (January 8, 2018) and after an arbitration hearing had been held on September 11, 2018. The Defendant also complains that Plaintiff failed to submit a written list of damages to the Defendant within thirty (30) days of the surrender of the premises and therefore forfeited its right to withhold the security and seek damages pursuant to the Landlord Tenant Act (68 PA. C. S. A. section 250.512(b)). Defendant complains that the property damages in the

2.

amount of $6,883.87 were not supported by the weight of the evidence because Plaintiff failed to establish any damage between his date of purchase of the premises (May 2, 2017) and the date Defendant vacated the premises (December 4, 2017), Finally, Defendant alleges error in this Court's failure to consider the age of the items that needed to be replaced, that most items were fifteen (15) years old or older, and that the Court should have used the value of the property at the time it was damaged as opposed to the replacement value of the property.

## Discussion

This Court incorporates hereto its Decision of July 9, 2019 and the findings of fact, conclusions of law and the appendix attached thereto. Tenant moved into the premises on February 1, 2002 pursuant to the residential lease agreement. Plaintiff purchased the premises on May 2, 2017. Tenant withheld $78.01 from her November 1, 2017 rental payment due to the purchase of paint and repair cost for alleged damage to a ceiling. Landlord responded with a notice of default and a notice of termination of the lease. The tenant then contacted the City of Chester, which issued a November 17, 2017 violation notice to Plaintiff for failure to rent the premises with a Certificate of Occupancy as required by City of Chester Ordinance Number 9 of 2016, Article 1703.02. Tenant vacated the premises on December 4, 2017.

Article 1703.02 of the City of Chester provides that an owner who fails to obtain a use and occupancy permit "... shall be subject to all remedies allowed by law including prosecution and fines under any applicable city Ordinance and in addition thereto they shall be denied the right to recover possession of the premises or to collect rent during any period of noncompliance." Pursuant to this provision, this Court's July 9, 2019 Decision did not award Plaintiff any rental damages it sought for December 2017, and January and February 2018.

3.

Contrary to Defendant's argument, Article 1703.02 does not provide for tenant recovery of prior rental payments against landlords but only prohibits the collection of rent by the landlord. This Court further notes that this claim was pled in the amended new matter filed by the Defendant and not in the amended counterclaim.

This Court found Neal Fulves's testimony credible that the Defendant failed to provide her forwarding address to the Plaintiff upon vacating the premises. Therefore section 250.512 (b) of the Landlord Tenant Act barring recovery by landlord for premise damages for failure to provide a written list to tenant within (30) days was not applicable to this proceeding. Defendant's counsel cited his client's December 15, 2017 Notice of Appeal to the Common Pleas Court from the Magisterial District Court landlord/tenant judgment which contained Defendant's new address and submitted that this Notice complied with section 250.512(b). However, Section 250.512(e) requires tenants to provide their new address in writing upon termination or surrender and acceptance of the leasehold premises. Tenant filed her new address of record with this Court on December 15, 2017. Plaintiff filed its complaint with damages detailed on January 8, 2018. This court finds no violation of Section 250.512.

This Court's findings of fact and the transcript at page fifteen (15) establishes that John C. Winter in inspecting the premises on January 12, 2019 testified that the condition in the premises on that date were substantially similar to the photographs taken by the Plaintiff depicting the premises on April 23, 2017, December 1, 4, and 24, 2017 and January 13, 2018. This Court found credible the testimony of John C. Winter that his estimate was based on the condition and damages to the premises at the time the Defendant vacated the premises. The

4.

testimony of Neal Fulves was also accepted as detailing the damages to the premises after his purchase of the property.

Plaintiff established that the damaged occurred in the premises between the date of his purchase May 2, 2017 and the date Defendants vacated the premises on December 4, 2017. The photographs depict soiled carpets, floors, damaged window blinds, trash, and other debris that this Court awarded in its decision to Plaintiff. Defendant failed to present any evidence establishing that the value of the property was less than the damage to the premises caused by the Defendant. Damage to property is covered generally by Pa.S.S.J.I. (Civ.) Section 7.150. Where damages to property do not amount to total loss, damages should be measured by the difference between the value of the chattel before the harm and the value after the harm, or at Plaintiff's election, the reasonable cost of repair or restoration. *Lobozzo v. Adam Eidemiller, Inc.*, 263 A.2d 432 (Pa. 1970). Plaintiff in this proceeding opted for the reasonable cost of repair or restoration. Defendant failed to present any value concerning damages except the purchase price of the property. This Court awarded damages which were less than the recent purchase price paid by Plaintiff.

For these reasons, this Court entered its Decision of July 9, 2019 and requests its Decision not be disturbed.

BY THE COURT:

_____
SPIROS E. ANGELOS, J.

5.